## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WESLEY HAMILTON, et al.,

Plaintiffs,

v.

DISTRICT OF COLUMBIA,

Defendant.

Civil Action No. 09-00892 (JDB)

### MEMORANDUM OPINION

Plaintiffs Wesley Hamilton and Joseph Mitchell are former arson investigators for the

District of Columbia Fire and Emergency Medical Services ("DCFEMS").   They allege that

DCFEMS sought to adversely affect their employment because they are African-American, and

have they filed suit against the District of Columbia ("the District") and DCFEMS claiming

violations of 42 U.S.C. §§ 1981, 1983, and 1985, and intentional infliction of emotional distress.

In a prior opinion, this Court dismissed plaintiffs' § 1985 claim and defendant DCFEMS.

Hamilton v. District of Columbia, 720 F. Supp. 2d 102, 107-09 (D.D.C. 2010).   The District has

now moved for summary judgment, on the ground that plaintiffs' § 1981 and § 1983 claims are

barred by the statute of limitations and that plaintiffs cannot establish that a policy or custom of the

District caused the adverse employment action that they challenge here.   Additionally, the District

moves for summary judgment on plaintiffs' intentional infliction of emotional distress ("IIED")

claim, arguing that it is barred by the statute of limitations, that plaintiffs failed to provide notice

under D.C. Code § 12-309, and that plaintiffs cannot demonstrate extreme and outrageous

conduct.   For the reasons that follow, the District's motion for summary judgment will be granted.

## BACKGROUND

The background facts have already been well-documented in the Court's prior opinion.

The most relevant facts are set forth here.   Plaintiffs Sergeant Wesley Hamilton and Investigator

Joseph Mitchell were members of DCFEMS's Fire/Arson Investigation Unit.   See Hamilton, 720

F. Supp. 2d at 106.   On October 17, 2004 they investigated a fire at 3318 Prospect Street, NW,

Washington, DC.   Id.   Subsequent to plaintiffs' investigation of the fire, allegations were made

that they had improperly conducted the investigation and thus reached an erroneous conclusion as

to the cause of the fire, and had lied to supervisors about their conduct.   Id.   These allegations

were communicated to the U.S. Attorney's Office for the District of Columbia.   On November 10,

2004, the U.S. Attorney's Office notified DCFEMS that it would not sponsor plaintiffs' testimony

in future arson cases unless DCFEMS could clear up the allegations.   Id.   DCFEMS did not

provide exculpatory evidence to the U.S. Attorney's office and plaintiffs' names were placed on

the "Lewis list," which prevented plaintiffs from testifying on behalf of the government in criminal

cases.   Plaintiffs were thereafter transferred to other units within DCFEMS into what they

characterize as lower status positions that were less well paid.   Id.; Hamilton Dep., Pl.'s Ex. 1 at

30-32.

In December 2004, DCFEMS brought disciplinary charges against plaintiffs, claiming that

they failed to follow protocol and procedures while conducting the Prospect Street fire

investigation.   Hamilton, 720 F. Supp. 2d at 106.   After an investigation lasting more than a year,

the DCFEMS Trial Board found plaintiffs not guilty of all charges.   Id.   Plaintiffs were notified

2

of the Trial Board's conclusions on January 9, 2006.   Id.   Plaintiffs subsequently made requests

to the fire chief and the deputy fire chief (Gary Palmer) to be reinstated to the fire investigations

unit, but their requests were either ignored or denied.   Hamilton Dep., Def. Ex. 1 at 43:17-19,

45-47; Mitchell Dep., Def. Ex. 3 at 39:9-11.   They then made the same request via their attorney

to DCFEMS General Counsel, who responded in a letter dated May 30, 2006 that DCFEMS had no

control over the Lewis list and that plaintiffs could not be reinstated unless they succeeded in

getting their names removed from the Lewis list.   Pls.'s Ex. 6.   As of May 2009, when plaintiffs

filed their complaint, their names remained on the Lewis list.   Hamilton, 720 F. Supp. 2d at 106.

On July 6, 2010, the Court dismissed DCFEMS from the action, and dismissed the §

1985(3) claim against the District.   It denied the motion to dismiss as to the § 1981 and § 1983

claims, and the IIED claim.   Following discovery, the District now moves for summary judgment

on those claims.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(a). The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion

by identifying those portions of "the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for purposes of

motion only), admissions, interrogatory answers, or other materials," which it believes

demonstrate the absence of a genuine issue of material fact.   Fed.R.Civ.P. 56(c)(1).

In determining whether there exists a genuine dispute of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.   Id. at 252.   By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.   Celotex, 477 U.S. at 322.   Moreover, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted).   Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## DISCUSSION

**I.   Plaintiffs' § 1981 and § 1983 Claims**

**A.  Statute of Limitations**

The District argues that plaintiffs' § 1981 and § 1983 claims are barred by the statute of limitations. The parties disagree over the applicable statute of limitations, as well as the accrual date for plaintiffs' claims.

State law governs the applicable statute of limitations for plaintiffs' § 1983 claim. Banks v. Chesapeake & Potomac Tele. Co., 802 F.2d 1416, 1418-21 (D.C. Cir. 1986).   In the District of Columbia, the applicable statute of limitations is three years.   See Camey v. Am. Univ., 151 F.3d 1090, 1096 (D.C. Cir. 1998) (three-year residual statute of limitations in D.C. Code § 12-301(8) applies to claims under § 1983).   Before 1991, all claims under § 1981 were also subject to the forum state's period for personal injury claims.   However, on December 1, 1990, Congress passed 42 U.S.C. § 1658, which created a standardized four-year statute of limitations for all civil actions

"arising under an Act of Congress enacted after the date of the enactment of this section."   This

clause has been interpreted to mean that claims which are "made possible" by a post-1990

enactment, including the Civil Rights Act of 1991, are governed by § 1658's four-year statutory

period.   Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83 (2004).   The Civil Rights Act

of 1991 expanded the scope of § 1981 claims to include protecting the right to "make and enforce

contracts" without respect to race. 42 U.S.C. § 1981(a).   Because plaintiffs allege that the District

"interfered with the performance of an existing contract . . . [and] denied the plaintiffs the benefits

of their contract with the city," causing "a sever [sic] loss of pay and prestige," Pls.' Opp. at 12,

their claims appropriately arise under the Civil Rights Act of 1991 and are therefore subject to the

four-year statutory period provided for in § 1658.   See Jones, 541 U.S. at 372; see also Graves v.

District of Columbia, 777 F. Supp. 2d 109, 115-16 (D.D.C. 2011).   The fact that plaintiffs must

enforce their § 1981 claims through the remedy outlined in § 1983 does not change the effective

statute of limitations period for the cause of action. Given the three- and four-year statute of

limitations periods for the § 1983 and § 1981 claims respectively, any claims premised on

discriminatory conduct occurring before May 11, 2006, for the § 1983 claims, and before May 11,

2005, for the § 1981 claims, are time-barred.

        Plaintiffs' complaint and pleadings are rife with typographical and grammatical errors

which make them difficult to follow.   However, from what the Court can discern, it appears that

plaintiffs refer to three actions as reflective of the alleged discriminatory conduct from which to

measure the statute of limitations.   In their complaint, plaintiffs allege that the District violated §

1981 and § 1983 when it initially removed plaintiffs from the Fire Investigation Unit in late 2004.

Compl. ¶¶ 26(c), 33.   They also allege that the District discriminated against them when it

subjected plaintiffs to repeated transfers.   Id. ¶¶ 21, 26(b), 34.   Finally, the complaint also states

that DCFEMS failed to reinstate plaintiffs as arson investigators after they were cleared of charges

in 2006, and that DCFEMS failed to notify the U.S. Attorney's Office that the charges had been

cleared and that plaintiffs should be removed from the Lewis list.   Id. ¶ 21-22.   Plaintiffs'

opposition to the District's summary judgment motion focuses entirely on DCFEMS's failure to

reinstate plaintiffs as arson investigators after they were cleared of charges in 2006, claiming that

this failure to reinstate effectuated the District's violation of § 1981 and § 1983.   Pls.' Opp. at 7.

Neither party discusses at any length the repeated transfers, nor does this allegation appear to be

treated as a separate claim.

To the extent that plaintiffs' § 1981 and § 1983 claims are premised upon the District's

removal of plaintiffs from the Arson Investigation Unit, which occurred in 2004, the Court agrees

that such claims are time-barred.   However, the § 1981 and § 1983 claims premised on the

District's failure to reinstate plaintiffs -- which all parties agree occurred at some point in 2006 -- is

a closer call.[1]

---

[1] While plaintiffs' complaint does not clearly articulate or list the District's failure to reinstate them
as fire investigators as an independent basis for their § 1981 and § 1983 claims, the allegations in
the complaint, taken together, indicate that plaintiffs considered non-reinstatement, despite being
exonerated by the trial board, to be an adverse employment action.   See Compl. ¶¶ 21-22.
Liberally construing plaintiffs' complaint, the District's failure to reinstate them could be
considered a separate basis for plaintiffs' discrimination claims. See Datto v. Harrison, 664 F.
Supp. 2d 472, 494-95 (E.D. Pa. 2009) (holding that plaintiff's ADA claim premised on school's
decision to dismiss him from the program was time-barred, but plaintiff's ADA claim premised on
the school's refusal to reinstate him after he had met their conditions for reinstatement was not);
Mott v. Synthetic Indus., CIV. A. 4:94–CV–248RLV, 1995 WL 584734 at *3 (N.D. Ga. Aug. 9,
1995) (finding that plaintiff had alleged two separate discriminatory acts -- placing him on an
unpaid medical leave of absence, and refusing to reinstate him after he was cleared to work by his
doctor).   The District has not challenged the sufficiency of the complaint with respect to the
failure to reinstate plaintiffs and indeed, does not discuss these arguments raised by plaintiffs in
any great length.

The District spends little time discussing plaintiffs' argument that the District's refusal to reinstate them is the appropriate point from which to measure the statute of limitations.   It does argue that to the extent any of plaintiffs' claims accrued in 2006, then January 9, 2006 -- when plaintiffs were notified that the Trial Board had found them not guilty of the charges -- is the appropriate date from which to measure whether plaintiffs' claims are barred.[2]   Plaintiffs accurately note that the statute of limitations begins to run on the date they knew or had reason to know of the facts that form the basis for their claim.   See Johnson v. Holder, 377 F. App'x. 31, 32 (D.C. Cir. 2010) (holding that the statute of limitations for plaintiff's § 1981 claim began to run on the date plaintiff knew or had reason to know facts that gave rise to his claim).   Plaintiffs claim that they were "unaware that they would not be sent back to the Arson Investigation Unit until May 30, 2006," when they were notified by DCFEMS General Counsel that no reinstatement would take place unless the U.S. Attorney's Office removed their names from the Lewis list.[3]   Pls.' Material Facts in Dispute, ¶ 9; Pls.' Opp. at 9.   Employing the May 30, 2006 date, plaintiffs' § 1981 and § 1983 claims would be timely. Using the January 9, 2006 date suggested by the District, plaintiffs' § 1981 claims would be timely under the four-year statute of limitations, but their § 1983 claims, governed by a three-year statute of limitations, would be time-barred.

---

[2]   The District premises its entire discussion of the statute of limitations issue on the assumption that plaintiffs' transfer out of the fire investigative unit was the sole adverse employment action. The District does not discuss the failure to reinstate plaintiffs as a separate act of discrimination, and therefore does not specifically address when plaintiffs' claim premised on that act should accrue.

[3]   In their depositions, Hamilton and Mitchell each indicated that, after receiving notice that they had been cleared of charges by the Trial Board, they contacted the DCFEMS fire chief and deputy fire chief and requested to be reinstated, but that their requests were rebuffed.   Hamilton Dep., Def.'s Exh. 1 at 45:16-19; Mitchell Dep., Def.'s Exh. 3 at 39:9-11. While it is probable that these conversations, which occurred sometime between January 9 and May 30, 2006, were sufficient to confer upon plaintiffs the knowledge that they would not be reinstated, neither party has provided the dates of these contacts.

Because assessments of the "statute of limitations often depend on contested questions of fact a court should hesitate to dismiss a complaint on statute of limitations grounds." See Smith-Thompson v. District of Columbia, 657 F. Supp. 2d 123, 130 (D.D.C. 2009) (citing Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996)).   Instead, a complaint should be dismissed on statute of limitations grounds only if it is conclusively time-barred and "'no reasonable person could disagree on the date' on which the cause of action accrued." See id. (citing Kuwait Airlines Corp. v. Am. Sec. Bank, N.A., 890 F. 2d 456, 463 n. 11 (D.C. Cir. 1989), and Doe v. Dep't of Justice, 753 F.2d 1092, 1115 (D.C. Cir. 1985).   Because the parties are in genuine dispute as to the date that plaintiffs became aware of the District's refusal to reinstate them, the Court will decline to find that plaintiffs' § 1981 and § 1983 claims based on the failure to reinstate are time-barred, and instead turn to the merits of those claims.

**B. Merits of § 1981 and § 1983 Claims**

Section 1983 of the Civil Rights Act of 1871 establishes liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.   As this Court previously stated, plaintiffs' complaint can be reasonably understood as raising a Fifth Amendment equal protection claim.   Hamilton, 720 F. Supp. 2d at 112.   Section 1981 "protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts," including contracts for employment, "without respect for race." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474-75 (2006) (quoting 42 U.S.C. § 1981(a)).   Courts evaluating § 1981 and § 1983 claims of employer

discrimination must assess whether the employer intentionally discriminated against the plaintiff. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000).

The familiar burden-shifting framework set forth in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973), applies in § 1981 and § 1983 cases where, as here, a plaintiff presents only circumstantial evidence that racial discrimination caused an adverse employment action.   Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137 (D.C. Cir. 2008) (applying the McDonnell Douglas framework to § 1981 claims); Jo v. Dist. of Columbia, 582 F. Supp. 2d 51, 60 (D.D.C. 2008) (§ 1983 case applying McDonnell Douglas).   Under McDonnell Douglas, plaintiffs must first establish a prima facie case of discrimination by showing that "(1) [he] is a member of a protected class; (2)[he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."   Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006).   The burden then shifts to the employer to articulate a "legitimate, nondiscriminatory" justification for the adverse employment action. McDonnell Douglas, 411 U.S. at 802.   Where an employer offers "clear and reasonably specific" nondiscriminatory reasons for the adverse employment action, Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981), the court "should not decide whether the plaintiff has made out a prima facie case," and should instead "proceed[] to the ultimate issue of [discrimination] vel non."   Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009). Finally, where a plaintiff can establish a predicate constitutional violation under § 1983, a municipality such as the defendant in this case is liable only for "action pursuant to official municipal policy." Triplett v. Dist. of Columbia, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 691 (1978).   Given that this Court has previously determined that plaintiffs' § 1981 claim

must be remedied exclusively under § 1983, defendants' liability under § 1981 is also contingent

on a finding that municipal policy acted as a "moving force" behind the violations.   See Hamilton,

720 F. Supp. 2d at 114; see also Domino's Pizza, 546 U.S. at 480.

*1. Plaintiffs Prima Facie Case*

The D.C. Circuit has explained that the prima facie case "'is almost always irrelevant'

because 'by the time the district court considers an employer's motion for summary judgment . . .

the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the

challenged decision.'" Jones, 557 F.3d at 678.   The District challenges whether plaintiffs have set

forth enough evidence to infer the existence of intentional discrimination, and the Court finds that

the District has failed to put forth a legitimate, non-discriminatory reason; hence, assessment of

plaintiffs' prima facie case is appropriate.   See Beyene v. Hilton Hotels Corp., 815 F. Supp. 2d

235, 246 n.14 (D.D.C. 2011) (proceeding with the McDonnell Douglas analysis where defendant

failed to put forth a legitimate, non-discriminatory reason); Thomas v. Vilsack, 718 F. Supp. 2d

106, 122-23 (D.D.C. 2010) (analyzing plaintiff's prima facie case where the court concluded that

defendant's asserted nondiscriminatory reason was not legitimate).   A plaintiff establishes a

prima facie case under McDonnell Douglas by showing "(1) [he] is a member of a protected class;

(2)[he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an

inference of discrimination."   Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006)

(citing Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999))

The District does not appear to challenge the first and second elements of plaintiffs' prima

facie case.   However, it does dispute whether the adverse employment actions asserted by

plaintiffs give rise to an inference of discrimination.   Plaintiffs have provided circumstantial evidence which they claim does so.

First, they contend that their immediate supervisor's interest in hiring more Caucasians was widely known by themselves and others in the unit.   Mitchell Dep., Pls.' Ex. 2 at 20: 6-8; Pls.' Opp. at 16.   Plaintiff Mitchell states in his deposition that he heard his supervisor say that, "if we had more whites in this unit, we could get more resources and this would be a more creditable or recognized unit."   Mitchell Dep., Pls.' Ex. 2 at 20: 6-8.

Second, plaintiffs have presented evidence relating to hiring and overtime disparities. Plaintiffs contend that a DCFEMS employee roster demonstrates that in 2004 there were seven African-American investigators and no Caucasian investigators, while in 2010 there were twelve Caucasian investigators and twelve African-American investigators.   Pls.' Ex. 16.[4]   Defendants argue that there can be no inference of discrimination because the overall number of African-American investigators in the unit did not decrease.   Def. Mot. for Sum. J. at 13. Plaintiffs respond that the increase in Caucasian fire investigators was dramatically larger than the increase in African-American fire investigators.   Pls.' Opp. at 15.   Plaintiffs also note that Caucasian investigators received more overtime during the period between 2003 and 2010.   Pls.' Opp. at 22.   The disparity in overtime pay between Caucasian and African-American fire

---

[4]   The employee roster of DCFEMS investigators between 2004 and 2010, which is relied upon by both parties, is unclear and appears to be at odds with other evidence in the record.   For example, the roster does not include plaintiff Joseph Mitchell.   The District also attaches a record of a disciplinary action taken in 2007 against a Caucasian investigator, whereas the employee roster reflects no Caucasian employees in 2007.   Plaintiffs also note that the employee roster does not reflect the fact that employees Gregory Bowyer and Gerald Pennington were removed from the unit in 2008.   Plaintiffs repeatedly misconstrue the roster as reflecting that the fire investigative unit employed 24 Caucasian fire investigators in 2010, rather than 12.   Pls.' Opp. at 15, 19; Pls.' Stmt. of Material Facts in Dispute at 2.

investigators averaged about 10% between 2004 and 2010.   Def. Mot. for Sum. J. at 15. The District concedes this but suggests it is insufficient to demonstrate a policy or custom of discrimination.

Third, plaintiffs point out that there remained open positions in the unit even after they had requested to be reinstated, and that subsequent hires were Caucasian, less qualified, and less experienced.   The FEMS employee roster reflects three to nine vacancies in the unit between January 2006 and March 2009.   Pls.' Ex. 9.   Plaintiff Hamilton testified in his deposition that after he requested to be reinstated, a less qualified Caucasian was assigned to the position. Hamilton Dep., Pls.' Ex. 1 at 37-39.

Fourth, plaintiffs claim that discriminatory animus is also demonstrated by an incident which occurred in June 2006 during which their front-line supervisor allegedly attempted to influence the hiring of Caucasian applicants into the Fire Investigation Unit.   A report of the Office of the Inspector General ("OIG") reviewed allegations that this supervisor had provided exam questions prior to the final exam to applicants taking a FEMS Arson Training Class.   See generally Pls.' Ex. 10.   The report concluded that the supervisor had violated protocol by giving preferential treatment to some students in the class but did not investigate the related complaint that the students who received preferential treatment were Caucasian.   Pls.' Opp. at 16.   The report noted that in the course of the OIG's investigation it had received testimony from a fire official that more Caucasians were wanted in the unit, but the OIG concluded that further investigation of the issue was outside its jurisdiction.   Id.   The report also noted that the department's internal Equal Employment Opportunity (EEO) office, which investigated the companion EEO complaint, did not substantiate a finding of discrimination.   Id.

12

Fifth, plaintiffs cite to a case filed by two other former Fire Investigation Unit employees who are also suing the District for discrimination.   Bowyer v. District of Columbia, 1:09-cv-00319-BAH (D.D.C.).   Plaintiffs note that those former employees have alleged that DCFEMS made specific policy changes beginning in 2007 that were designed to increase the number of Caucasian investigators in the unit.   Pl. Ex. 15 at 4-5.   To the extent that these allegedly discriminatory policies were not implemented until 2007, they do not serve to demonstrate that an adverse employment action taken against plaintiffs in 2006 was the by-product of discrimination.   Moreover, plaintiffs have not argued that these practices were in place at the time of the discriminatory action complained of in this case.

The District argues that none of this evidence demonstrates that discriminatory animus caused the plaintiffs' adverse employment action.   The District's argument rests in large part upon the presumption that the discriminatory action claimed by plaintiffs occurred in 2004, while the evidence presented by plaintiffs relates substantially to events occurring in 2006 and 2007. Def. Mot. for Sum. J. at 16.   But plaintiffs also claim that discriminatory animus motivated the District's failure to reinstate them in 2006.   The District has not argued that causality as to discriminatory acts in 2006 cannot be inferred from plaintiffs' evidence and therefore the Court cannot find that the evidence produced by plaintiffs is too far removed in time to bear on the issue of causation.   The Court declines to opine as to whether any of the above evidence would be sufficient standing alone, but certainly taken together the evidence could warrant a reasonable observer to draw an inference of discrimination.   See Nelson v. Hinman, No. L–10–1816, 2012 WL 395119, at *7 (D. Md. Feb. 6, 2012) (concluding that an inference of discrimination was appropriate considering the totality of the evidence).

13

Under the McDonnell Douglas framework, a defendant can still succeed at the summary judgment stage if it can "articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802.   However, in its motion for summary judgment, the District only articulates the reason for plaintiffs' initial transfer in 2004, and does not articulate a legitimate reason why plaintiffs were denied reinstatement after being exonerated by the DCFEMS Trial Board.   Plaintiffs submit a letter written by the DCFEMS general counsel, indicating that plaintiffs were not reinstated because their names were still on the Lewis list, which made them unable to satisfy the job requirements for a fire investigator, and that DCFEMS did not have any control over the placement of names on the Lewis list.   Pls.' Ex. 6.   Plaintiffs point to the November 10, 2004 letter from the U.S. Attorney's office, which articulated that DCFEMS was in a position to affect the placement of the plaintiffs' names on the Lewis list by contradicting the information it had received about plaintiffs.   Pls. Ex. 4.   The District has provided no response. It is not clear whether DCFEMS would similarly have been able to affect the plaintiffs' Lewis list status in 2006 after plaintiffs were exonerated by the DCFEMS Trial Board.   But because the District has not put forth a legitimate, nondiscriminatory reason for DCFEMS's failure to reinstate plaintiffs, it has failed to rebut plaintiffs' prima facie case of intentional discrimination.   King v. Palmer, 778 F.2d 878, 882 (D.C. Cir. 1985).   Further consideration of whether a reasonable jury would find this defendant's actions discriminatory would ordinarily fall to a finder of fact; however, because the defendant here is also a municipal government, the plaintiffs bear the additional burden of demonstrating that a policy or custom caused their injuries.

*2. "Policy or Custom"*

In order to hold a local government liable for constitutional torts under § 1983, a plaintiff must prove that "a custom or policy" of the municipality caused the violation.   See Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing Monell, 436 U.S. at 694). Plaintiffs can establish that a custom or policy of the District violated their constitutional rights by demonstrating (1) "the explicit setting of a policy by the government," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom," or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."   Baker, 326 F.3d at 1306 (internal citations omitted).

Plaintiffs argue that "high level officials within the Agency were complicit in the actions taken against the plaintiffs," or alternatively, that the District's "deliberate indifference" led to violation of their constitutional rights.   Pls.' Opp. at 22.   As to their first argument, it is unclear whether plaintiffs are alleging that the alleged discriminatory actions were taken by a "final policy maker," and if so, which "high level officials" plaintiffs refer to.   None are identified.   Plaintiffs' pleadings refer only to actions taken by their immediate supervisor, Sergeant Proctor, as well as Deputy Fire Chief Gary Palmer.   Pls.' Opp. at 15, 17-18; Hamilton's Dep, Def. Ex. 1 at 45-46; Mitchell's Dep., Def. Ex. 3 at 39, line 9-11.   However, because neither official has "final policymaking authority [under] state law," their actions are insufficient to constitute a custom or policy and thereby confer liability on the District.   Triplett, 108 F.3d at 1453 (quoting Jett v. Dallas Indep. Schl. Dist., 491 U.S. 701, 737 (1989)).

Whether an individual has final policymaking authority is assessed by looking to local law. See Triplett, 108 F.3d at 1453 (finding that the Director of the Department of Corrections was a final policymaker where the D.C. Code specified that he was responsible for "the general direction and supervision" of the Department); Byrd v. District of Columbia, 807 F. Supp. 2d 37, 75 (D.D.C. 2011) (distinguishing plaintiff's claim that the Director of D.C. Parks and Recreation had final policymaking authority from prior cases where a grant of authority was articulated in the D.C. Code). The relevant statute in this case, D.C. Code § 5–402(a), specifically grants the Mayor of the District of Columbia the authority to make personnel decisions with respect to DCFEMS. Because the D.C. Code does not grant either plaintiffs' supervisor or Deputy Fire Chief Gary Palmer final policymaking authority, their actions do not subject the District to § 1983 liability. See Coleman v. District of Columbia, 2011 WL 6076329, at *3 (D.D.C. 2011) (holding that the DCFEMS Chief is not a final policymaker for § 1983 purposes).

Plaintiffs' second argument -- that the District has demonstrated deliberate indifference to violation of plaintiffs' constitutional rights – fares no better. To demonstrate that the District was deliberately indifferent to constitutional violations such that it should be liable under § 1983, plaintiffs must demonstrate that the District "adopt[ed] a policy of inaction" when "faced with actual or constructive knowledge that its agents will probably violate constitutional rights." Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004). Deliberate indifference is difficult to show and "require[s] proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 131 S.Ct. 1350, 1360 (2011). A "lesser standard of fault would result in de facto respondeat superior liability on municipalities -- a result [the Supreme Court] rejected in Monell." City of Canton, Ohio v. Harris, 489 U.S. 378, 392

(1989).   The Supreme Court has noted that in nearly all situations plaintiffs must demonstrate a pattern of injuries in order to establish municipal culpability and causation under <u>Monell</u>. Without such a pattern, there can be "no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate." <u>Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown</u>, 520 U.S. 397, 408 (1997).

Plaintiffs do not articulate what supports their theory that the District was deliberately indifferent to violations of their constitutional rights.   They do not point to evidence that the District, the Mayor, or anyone with final policymaking authority had actual knowledge that plaintiffs were discriminated against on the basis of race.   They have acknowledged that they did not tell any of their supervisors that they believed they were being treated differently because of their race.   <u>See</u> Hamilton Dep., Def.'s Ex. 1 at 20-26; Mitchell Dep., Def.'s Ex. 3 at 25-26.   Nor were they aware of any complaints made by any others in their unit that they were being treated differently because of their race.   Hamilton Dep., Def.'s Ex. 1 at 26.   Hence, there is no appropriate inference to be drawn that the District had direct knowledge that plaintiffs' rights and the rights of others in the unit were being violated due to discriminatory practices.

Plaintiffs have instead presented evidence showing that the percentage of Caucasians in the Fire Investigation Unit increased substantially between 2004 and 2010, and that Caucasians on average received 10% more in overtime pay.   This data prompts more questions than it answers. Although there was a substantial increase in the number of Caucasian fire investigators after 2007, there were still far more African-American than Caucasian fire investigators employed during this same period.   It is unclear whether the changing racial composition of the unit was due to the improper consideration of race in hiring decisions, as plaintiffs must demonstrate, or simply the

result of changes in the demographics of applicants.   It is also unclear, given the substantial

variability of the number of individuals employed by the unit, whether any apparent racial

discrepancies are statistically significant.   See Watson v. Fort Worth Bank and Trust, 487 U.S.

977, 995 (1988) ("[S]tatistical disparities must be sufficiently substantial that they raise such an

inference of causation.")   Finally, even if this employment data does reflect discriminatory hiring

decisions, plaintiffs must demonstrate that such employment statistics gave rise to actual or

constructive knowledge on the part of the District that constitutional violations were occurring.

See Byrd v. District of Columbia, 807 F. Supp. 2d 37, 76 (D.D.C. 2011) (finding that the conduct

alleged by the plaintiffs was not so "widespread or obvious that the District's final policymakers

would have otherwise been aware of [unconstitutional practices]").   Given the difficulty that the

Court has in concluding that the data reflects intentional discrimination, an inference that the

District had constructive knowledge of unconstitutional practices is unwarranted.

       Plaintiffs' evidence of the alleged distribution of test questions to Caucasian applicants in

order to influence the racial composition of the Fire Investigation Unit does not help them

demonstrate deliberate indifference, because the supervisor allegedly responsible for the

discriminatory treatment was subsequently disciplined.   Def. Ex. 13. The fact that the supervisor

was disciplined contradicts plaintiffs' argument that the District was indifferent to alleged

unconstitutional conduct. See, e.g., Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist., 511

F.3d 1114, 1125 (2nd Cir. 2008) (noting that evidence showing that a municipal defendant took

remedial measures mitigates against a finding of deliberate indifference).

       Finally, the fact that two other former fire investigators have filed a similar suit against the

District also does not help plaintiffs.   They have not presented any evidence that would link the

discriminatory policies described in that suit, which were alleged to have been implemented in

early 2007, to plaintiffs' adverse employment action, which occurred in 2006.   Hence, even if

these allegations were taken as true, plaintiffs have failed to establish a "direct causal link between

a municipal policy or custom and the alleged constitutional deprivation." Canton, 489 U.S. at 385.

In sum, because plaintiffs have failed to establish the existence of a discriminatory custom

or policy, their § 1983 claim against the District must fail under Monell and its progeny.

Plaintiffs' § 1981 claim, which also depends on establishing the existence of a custom or policy,

fails for the same reasons.[5]  See Jett, 491 U.S. at 735-36.

## IV. Intentional Infliction of Emotional Distress

Count Three of the complaint asserts a claim for intentional infliction of emotional distress

("IIED").   The District argues that this claim should be dismissed because it is barred by the

statute of limitations and plaintiffs' failure to file a timely notice of claim under D.C. Code §

12-309.   The District also argues that plaintiffs' claim fails on the merits.   Plaintiffs respond that

the notice provisions of D.C. Code § 12-309 are not applicable to their IIED claim, but fail to

address the District's other arguments in favor of dismissal.   For the reasons discussed below, the

Court does not find plaintiffs' claim barred by the statute of limitations, but concludes that

plaintiffs failed to file the required notice under D.C. Code § 12-309 and will therefore grant the

District's motion to dismiss the claim.

Under D.C. Code § 12-301(8), causes of action for which a statute of limitations is not

otherwise prescribed are governed by the three-year residual provision.   Saunders v. Nemati, 580

A.2d 660, 661 (D.C. 1990).   Where intentional infliction of emotional distress is "intertwined"

---

[5]   Plaintiffs' complaint refers to a list allegedly compiled by DCFEMS management of African-American
firefighters DCFEMS sought to terminate as suggestive of a policy or custom.   Compl. ¶ 23; Hamilton, 720
F. Supp. 2d at 113.   However, the parties do not address this list in their pleadings or memoranda, and no
evidence of such a list has been produced.

with causes of action for which a statute of limitations is prescribed in other provisions of §
12-301, that other statute of limitations shall control.   Id. at 665.   Although plaintiffs' IIED claim
in this case is intertwined with their § 1983 and § 1981 claims, the latter are not causes of action for
which a period of limitations is specifically provided in the other provisions of § 12-301.   Thus
plaintiffs' IIED claim is bound by the three-year residual statute of limitations.   As previously
discussed, there are disputed facts as to when plaintiffs' discovered or should have discovered their
injury.   Construing the disputed facts in favor of the plaintiffs, the Court cannot find that
plaintiffs' claims were barred at the time of their May 11, 2009 filing date in this Court.

The District's argument that plaintiffs failed to provide the requisite notice is more
straightforward.   D.C. Code § 12-309 provides that "[a]n action may not be maintained against
the District of Columbia for unliquidated damages to person or property unless, within six months
after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in
writing to the Mayor of the District of Columbia of the approximate time, place, cause, and
circumstances of the injury or damage."   D.C. Code § 12-309.   Plaintiffs do not dispute that they
failed to provide the notice required under the statute.   Instead, they argue that because their IIED
claim is dependent upon their § 1981 and § 1983 claims, they are exempt from the notice
requirement.   Pl.'s Opp. at 23.   But, while plaintiffs are exempt from the notice requirement for
the purposes of their federal claims, they are not exempt for the purposes of their IIED claim,
which is a creation of D.C. common law.   See Bonaccorsy v. District of Columbia, 685 F. Supp.
2d 18, 23 (D.D.C. 2010) (dismissing plaintiff's common law claims, including IIED, for failure to
provide statutory notice under § 12-309, where the plaintiff also claimed violations of § 1981
under the same set of facts).   Accordingly, plaintiffs' IIED claim is barred for failure to timely
provide the required statutory notice.

The District argues that plaintiffs' IIED claim also fails on the merits as they have failed to present sufficient evidence of extreme and outrageous conduct.   The Court agrees.   To sustain an IIED claim under District of Columbia law, a plaintiff must allege: "(1) 'extreme and outrageous' conduct on the part of the defendant that (2) either intentionally or recklessly (3) caused the plaintiff severe emotional distress." <u>Abourezk v. New York Airlines, Inc.</u>, 895 F.2d 1456, 1458 (D.C. Cir. 1990).   Conduct is "extreme and outrageous" where it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."   <u>Kerrigan v. Britches of Georgetowne, Inc.</u>, 705 A.2d 624 (D.C. 1997) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).   Courts have noted that this a particularly high bar, especially in the employment context. <u>See, e.g.</u>, <u>Evans v. District of Columbia</u>, 391 F. Supp. 2d 160, 170 (D.D.C. 2005).

Here, plaintiffs have asserted no facts beyond those forming the basis of their § 1981 and § 1983 claims.   Essentially plaintiffs allege that they were falsely accused of professional misconduct and transferred and that the District's acts were racially motivated.   This conduct, even presumed to be true, is not sufficiently extreme and outrageous to constitute an IIED claim. Courts have regularly determined that no extreme and outrageous conduct existed under employment circumstances more extreme than those presented here.   <u>See</u> <u>Crowley v. N. Am. Telecomm. Assoc.</u>, 691 A.2d 1169, 1172 (D.C. 1997) (dismissing claim where plaintiff allegedly was subjected to contempt, scorn and other indignities by his supervisor, and received an unwarranted evaluation and discharge); <u>Hoffman v. Hill & Knowlton, Inc.</u>, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (finding conduct not outrageous when employer intentionally interfered with employee's ability to do job, stated false, pretextual reasons for dismissing an employee knowing it would be communicated to others, and dismissed employee).

21

As plaintiffs have failed to comply with the statutory notice requirement of D.C. Code § 12-309, and have not demonstrated extreme and outrageous conduct, their IIED claim must fail.

## **CONCLUSION**

For the reasons discussed above, the District's motion for summary judgment will be **GRANTED**.   A separate order was entered on March 30, 2012.

**SO ORDERED.**

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: April 5, 2012